

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 24, 2023

**BY ECF**

Honorable Jed S. Rakoff
United States District Court Judge
Southern District of New York
500 Pearl St.
New York, NY 10007

    Re:    *United States* **v.** *Joseph Rivera*, 22 Cr. 192 (JSR)

Dear Judge Rakoff:

    The Government respectfully submits this letter in connection with the sentencing of the defendant, Joseph Rivera, which is scheduled for January 31, 2023. For the reasons discussed below, the Government submits that a sentence within the stipulated Guidelines range of 57 to 60 months' imprisonment is warranted in this case.

    **I.**    **Offense Conduct**

    The charges against the defendant arose from his association with the Shooting Boys gang. The Shooting Boys is a criminal organization based in the University Heights of the Bronx. Since at least 2017, gang members used guns to commit numerous acts of violence against members of rival gangs throughout the Bronx. The Shooting Boys were originally associated with the Trinitarios gang but broke off from the Trinitarios in or about 2017. (PSR ¶ 37). The break from the Trinitarios was initiated by Andrew Done, a defendant in this case. Done is the recognized leader of the Shooting Boys. After the Shooting Boys broke off from the Trinitarios, an ongoing battle between the two gangs ensued. The end result was a series of violent acts and back and forth retaliation between the Shooting Boys and the Trinitarios. (PSR ¶ 37). Eventually, the Shooting Boys began to retaliate against other gangs affiliated or aligned with the Trinitarios. (PSR ¶ 37).

    The Shooting Boys' main source of income came from drug dealing and robberies. (PSR ¶ 38). Some of the robberies were committed against rival drug dealers while others involved individuals wearing high-end jewelry. For the most part, gang members sold drugs in two areas – Father Zeiser Place and 192nd Street and Aqueduct Avenue in the Bronx. Only the Shooting Boys or individuals sanctioned by the Shooting Boys were allowed to sell drugs in those areas. Profits from the gang's crimes would be split among the participants with some of it passed up to Done, the gang's leader, who, in turn, would use the money to purchase guns that were made available to gang members for use in robberies or shootings that were carried out on the gang's behalf, and for drugs that would eventually be sold or used by gang members.

Hon. Jed S. Rakoff
January 24, 2023
Page 2 of 5

Joseph Rivera, the defendant, was an associate of the Shooting Boys. (PSR ¶ 43). Rivera worked for co-defendant Edwin Jimenez in Jimenez's drug operation in the area of 155 Father Zeiser Place in the Bronx. (PSR ¶ 43). Jimenez and the Shooting Boys reached an agreement that allowed Jimenez and Rivera to distribute narcotics at that location. (PSR ¶ 45). Rivera conducted hand-to-hand transactions with customers who purchased cocaine and marijuana that Jimenez supplied. (PSR ¶ 43). Rivera was paid weekly based on how many of the drug sales he completed. (PSR ¶ 44). During the shifts that Rivera worked, Jimenez provided Rivera with a walkie-talkie to communicate with Jimenez when Rivera needed more narcotics. (PSR ¶ 44).

Rivera worked for Jimenez selling drug for at least four years. (PSR ¶ 44). He sold up to 500 bags of cocaine—each worth approximately $20—per day (in other words, up to $10,000 of cocaine per day). (PSR ¶ 44).

Jimenez also provided Rivera with a firearm for protection from potential robbers, which Rivera carried during the shifts Rivera worked distributing narcotics. (PSR ¶ 44). In addition, Rivera agreed to allow the Shooting Boys to store their guns in Rivera's apartment, in exchange for drugs or money. (PSR ¶ 45).

II.  **Procedural History**

On March 29, 2022, a grand jury in this district returned 22 Cr. 192 (JSR), a fifteen-count indictment (the "Indictment"), which charged the defendant in two counts. Count Fourteen charged Rivera with narcotics conspiracy, in violation of Title 21, United States Code, Sections 841(b)(1)(A), and 846. Count Fifteen charged Rivera with knowingly using and carrying firearms—which were brandished and discharged—in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), (ii), (iii), and 2.

Rivera was arrested on March 31, 2022. He was released on bail the same day, subject to conditions including home incarceration with location monitoring. Rivera was repeatedly noncompliant with the home incarceration condition. As your Honor noted at a bail revocation hearing on May 4, 2022, Rivera "left his residence without the express prior approval of the Court, as required, something like seven, eight, or nine times in between April 3 and April 21. So I infer from that that he is incapable of abiding by the conditions of his release . . . ." Tr. of May 4, 2022 Hrg, at 2 (Dkt. No. 56). When defense counsel noted that Rivera cares for his elderly mother, Your Honor responded, "Right. And he had so little respect for his mother that he repeatedly violated the conditions of release, knowing that that would more likely than not lead to his being remanded to her great detriment. Must not feel very good about his mother." *Id.* at 3. Given Rivera's repeated noncompliance, the Court ordered him remanded. *Id.* at 5.

The Court initially ordered that Rivera be remanded immediately, but defense counsel again invoked Rivera's mother and asked that Rivera be allowed to surrender 24 hours later so that he could make sure that his mother had care in place. *Id.* The Court agreed, and explained that Rivera needed to self-surrender the following day, stating, "So Mr. Rivera, you need to report to the U.S. Marshals in this building at 11:30 a.m. tomorrow. If you fail to do so, I will immediately

send the marshals out to arrest you. Do you understand?" *Id.* Rivera responded that he did. *Id.* at 6.

But Rivera did not surrender the next day as directed. Instead, he was a fugitive for approximately one month. A bench warrant was issued, and Rivera was apprehended on June 2, 2022. PSR ¶ 30. In the presentence interview, Rivera admitted to going on the "run" in order to avoid apprehension. PSR ¶ 63.

On October 21, 2022, Rivera pled guilty to a lesser included offense of Count 14: conspiracy to distribute and possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(b)(1)(D), 846. Under the plea agreement, Rivera is being held responsible for distributing 7,534 grams of marijuana and 300 grams of cocaine. (PSR ¶ 21). Rivera is also being held responsible for possessing a firearm during the offense. (PSR ¶ 21). Finally, Rivera is being held responsible for attempting to obstruct the administration of justice, in light of his willful failure to self-surrender as directed. (PSR ¶ 21). Putting it all together, the stipulated Guidelines Range is 57 to 71 months' imprisonment. (PSR ¶ 21). But because the statutory maximum sentence is 60 months' imprisonment, the stipulated Guidelines Range in the plea agreement is 57 to 60 months' imprisonment. (PSR ¶ 21).

Probation arrived at a slightly different calculation. Because of Rivera's failure to surrender, as directed, Probation did not include a three-point reduction for acceptance of responsibility. (PSR ¶ 150). Probation therefore arrived at a Guidelines Range of 77 to 96 months' imprisonment—which, due to the statutory maximum—amounts to a Guidelines "range" of 60 months' imprisonment. (PSR ¶ 149). Probation ultimately recommends a sentence of 54 months' imprisonment. (PSR p. 33).

### III. A Sentence Within the Stipulated Guidelines Range of 57 to 60 Months' Imprisonment Is Necessary

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to provide restitution to victims. *Id.* at 50 & n.6.

Here, these factors weigh in favor of a sentence within the stipulated Guidelines Range of 57 to 60 months' imprisonment.

*First*, a sentence within the Guidelines Range is necessary to reflect the nature and circumstances of the offense. Dealing narcotics is a very serious crime that facilitates devastating

addictions and puts the community at great risk. And this was not a one-time lapse in judgment: Rivera sold narcotics for more than four years. (PSR ¶ 44). Nor was this small-time drug dealing: Rivera was selling up to $10,000 worth of cocaine *per day*. (PSR ¶ 44). Rivera has admitted to trafficking 7,534 grams of marijuana and 300 grams of cocaine. (PSR ¶ 21).

Even worse, Rivera trafficked these narcotics in association with a dangerous street gang, and while possessing a firearm. Rivera was an associate of the Shooting Boys, a violent gang that reached an agreement with Jimenez that allowed Jimenez and Rivera to distribute narcotics in their territory. (PSR ¶¶ 43, 45). Rivera helped the gang by allowing gang members to store guns in his apartment in exchange for drugs and money. (PSR ¶ 45). And Rivera had a firearm in his possession during his drug-dealing shifts to protect him from potential robbers. (PSR ¶ 44). As the Court knows, drugs and violence often go hand-in-hand as drug dealers (and gang members) resort to violence to protect or seize lucrative drug territory. The defendant's possession of a firearm in connection with his drug dealing and his association with a gang suggest that, whether or not the defendant actually fired his weapon, he was ready and willing to do so if necessary. Rivera's gun possession and association with a dangerous gang—on top of his prolific drug dealing—created a serious danger to the community, and justify a substantial sentence.

*Second*, Rivera's history and characteristics weigh in favor of a sentence within the Guidelines Range. Rivera now has *thirty-two* criminal convictions—four felony convictions and twenty-eight misdemeanor convictions. (PSR p. 34). These include convictions for drug trafficking, attempted burglary, assault, menacing, weapon possession, attempted grand larceny, unauthorized use of a vehicle, criminal facilitation, drug possession, and obtaining transportation without paying. (PSR p. 34). In one instance, Rivera approached a victim at knifepoint, threatened to cut the victim, and thrust at the victim three times, trying to stab the victim in the stomach. (PSR ¶ 87). In addition to his convictions, Rivera has also violated parole on numerous occasions. (PSR ¶¶ 75, 76, p. 34).

Moreover, unlike many defendants who are sentenced by the Court, the defendant was raised "under average economic circumstances" and "[h]is childhood was void of any forms of abuse or maltreatment." PSR p. 34. Nevertheless, Rivera "neglected his mother's advice and later became involved in illegal activities." PSR p. 34. Rivera points to his mother's illness as a basis for a lenient sentence. *See* Def. Mem. at 8-9. But as the Court recognized at the bail hearing—the last time the defendant attempted to invoke his mother as a basis for leniency—Rivera knew about his mother's condition before he engaged in his misconduct, and therefore has no one to blame but himself for these adverse consequences. *See* Tr. of May 4, 2022 Hrg, at 3 (Dkt. No. 56).

*Third*, a within-Guidelines sentence is necessary to promote respect for the law. While on pretrial release, Rivera repeatedly violated his bail conditions. When the Court ordered him detained, he—once again—invoked his mother as the reason he should receive a 24-hour stay of the detention order. The Court agreed, crediting Rivera's need to care for his mother and providing Rivera with leniency. And instead of using that time to look out for his mother, Rivera used it to selfishly flee, in blatant violation of the Court's order to surrender the following day. Rivera was a fugitive for approximately one month until he was arrested on a bench warrant. Rivera's conduct

exhibits a deep disrespect for the Court and for the law. It shows that leniency does not work on Rivera, and that incarceration is necessary to promote respect for the law.

*Fourth*, the compelling need for both specific and general deterrence justifies a sentence of 57 to 60 months' imprisonment. Rivera's many prior interactions with the criminal justice system were clearly insufficient to deter him from committing new crimes. *See* PSR p. 35 ("It appears that prior sentences were not enough to deter him from continuing a life of crime."). The Court should impose a sentence that, unlike Rivera's prior punishments, ensures that he, and others like him, do not make these types of choices again.

*Fifth*, a within-Guidelines sentence is justified by the need to protect the public. There is a significant risk that, upon his release, Rivera will once again return to selling drugs and committing other crimes—just like he has done over and over again—fueling the addictions of others and devastating his community. A sentence of 57 to 60 months' imprisonment is therefore necessary to protect the public.

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the stipulated Guidelines Range of 57 to 60 months' imprisonment.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: \_\_\_\_/s/_____
Dominic A. Gentile
Adam S. Hobson
James Ligtenberg
Assistant United States Attorneys
(212) 637-2567/2484/2665

cc: Telemachus P. Kasulis, Esq. (Via ECF)
    Jorja N. Knauer, Esq. (Via ECF)